## In re Frank F. KURIAKUZ, Debtor.

### Bankruptcy No. 91–10669–R.

United States Bankruptcy Court,
E.D. Michigan, S.D.

June 16, 1993.

Jay Kalish, Bingham Farms, MI, for debtor.

Lawrence Stockler, Southfield, MI, for creditor.

## OPINION AND ORDER DISMISSING BANKRUPTCY CASE

STEVEN W. RHODES, Bankruptcy Judge.

### I.

The debtor filed this Chapter 13 petition on September 20, 1991. On November 14, 1991, Grosse Pointe Quality Food Company, a division of Farm House Foods Corporation ("the creditor") filed a motion to dismiss, alleging that the debtor is not eligible for relief under Chapter 13 because he is not a individual with regular income as required by 11 U.S.C. § 109(e) (1989), and that the case was filed in bad faith.[1] In support of the latter contention, the creditor notes that its judgment against the debtor (in the present approximate amount of $38,000) was held nondischargeable on the grounds of fraud in the debtor's 1978 bankruptcy case. The creditor further contends that the debtor's fraud had continued thereafter until the present case was filed.

The debtor's original plan was a base plan offering a total of $3,000 over the sixty month life of the plan, payable at the rate of $11.54 per week. In addition to the judgment debt owed to this creditor, Henry Ford Hospital filed a proof of claim in the total amount of $1,039.70.[2] Thus, the total debt is approximately $39,000, and creditors would be paid 7.7% under the debtor's original plan.

A hearing was set on the motion to dismiss for December 18, 1991, but the parties agreed to submit the motion on the briefs without a hearing.

On March 25, 1992, the Court held a confirmation hearing and confirmed the plan. The creditor did not appear. The order of confirmation increased the debtor's payments to $94 per month for sixty months and provided that the creditors would be paid at least 10%. Based on the claims filed, creditors will actually be paid approximately 14% under the order of confirmation.

On June 22, 1992, the Court entered an order denying the creditor's motion to dismiss.[3] The Court dealt specifically with

---

1. The debtor contends that this creditor is not the real party in interest. However, the Michigan Court of Appeals has ruled against the debtor on this issue. *Grosse Pointe Quality Food Company v. Kuriakuz,* No. 113695 (January 10, 1991). Accordingly, the Court rejects this contention.

2. The only other unsecured creditor listed in the debtor's schedules, Manufacturer's Hanover, did not file a claim.

3. This order also granted the debtor's motion for summary judgment in an adversary proceeding filed by the creditor seeking to hold the debt nondischargeable in this Chapter 13 case based

the issue of the debtor's eligibility under 11 U.S.C. § 109 (1989), but not with the good faith issue.

On December 21, 1992, the District Court entered an opinion affirming in part and reversing in part and remanding for further findings of fact. Specifically, the District Court affirmed this Court's conclusion that the creditor's claim is dischargeable in Chapter 13. The issue of the debtor's good faith was remanded for further findings of fact.

## II.

On remand, the Court conducted an evidentiary hearing on the issue of the debtor's good faith. On direct examination, the debtor testified that he has worked for North Shore Market since September of 1991. His wife owns this market. He earns $250 per week, working 25–35 hours per week. Previously, the debtor's wife owned a business called Mack and Bewick's Meats (Mack and Bewick). He testified that he worked there once in awhile and got paid. The debt to Grosse Pointe Quality Food Company arose from the Great Savings Market owned in part by the debtor in 1977 and 1978.

On cross examination, the debtor testified that he recalled a lawsuit that he filed in 1985 against his insurance company, Auto Club Insurance Association. At first the debtor denied making a claim for lost wages, but later admitted receiving money for lost wages, including lost wages for work at Mack and Bewick. At a deposition in that suit in 1985, the debtor testified that he was self-employed at Mack and Bewick full time as a meat cutter. His application for benefits was to the same effect. He also testified at the deposition that his wife did not work there, she was a housewife. At a deposition on July 17, 1991, the debtor testified that he was not paid for his work at Mack and Bewick. According to their tax records, his wife received no pay either. The debtor concluded by testifying that he helped out at Mack and Bewick from 1978 until it closed in 1991.

upon the prior nondischargeability determina-

The debtor's wife, Maria Kuriakuz, testified on direct examination that she has owned a small market in Waterford Township called the North Shore Market since 1991. At that time, she purchased it as a corporation for $430,000. She paid $45,000 as a down payment and signed a note for the balance of $385,000. She works there every day. Her four children also work there. Her husband, the debtor, also works there and receives cash (in lieu of a check) regularly. She deducts taxes for him.

On cross examination, Mrs. Kuriakuz testified that she does not recall whether the debtor received a regular paycheck at Mack and Bewick. At a deposition on July 17, 1991, she testified he was not on the payroll, although he did help out, working two hours a day cutting meat. At the deposition, she apparently forgot the address of that market and the name of the bank where the account for the market was maintained.

The creditor called Karen Krystof to testify. On direct examination, she testified that she is a claims supervisor for AAA, and handled the debtor's claim in 1985. This claim was for medical benefits and wage losses from an auto accident on January 17, 1985. A series of payments for wage losses was made from then through February of 1989. AAA hired an independent CPA to verify the debtor's wage loss, since he stated he was self employed. He claimed he worked as a butcher at Mack and Bewick, more than five days per week.

## III.

Based on these facts, the debtor argues his plan and the order confirming the plan require him to pay all of his net disposable income based on his budget for five years. His employment and income are stable. Nothing suggests his schedules are inaccurate. The debtor argues that the inconsistencies in the prior depositions do not adversely affect his present good faith, and that the existence of the one debt that would be nondischargeable in Chapter 7 is not conclusive on the good faith issue. He

tion.

argues that his sincerity is evidenced by his regular and current payments to the trustee, and that his prior 1978 case should not disqualify him from his present Chapter 13 case.

The creditor argues that the debtor has engaged in a pattern of deceit beginning with the fraud that led to the debt, which involved paying for goods with a bad check. The creditor argues that this pattern continued with the debtor's fraudulent wage loss claim to AAA, and his false testimony to the creditor that he earned nothing at Mack and Bewick. Noting that the debtor has only one other creditor, with a nominal debt, the creditor argues that the debtor's intent is to beat it out of its rightful claim. Finally, the creditor argues that this intent is demonstrated in the debtor's denial of income in the depositions it took while at the same time submitting a wage loss claim to AAA.

## IV.

■ The issue of whether the debtor filed this case in good faith can only be determined based upon an examination of the totality of the circumstances. *In re Barrett*, 964 F.2d 588 (6th Cir.1992); *In re Caldwell*, 895 F.2d 1123 (6th Cir.1990) (hereinafter *Caldwell II*); *In re Caldwell*, 851 F.2d 852 (6th Cir.1988) (hereinafter *Caldwell I*); *In re Doersam*, 849 F.2d 237 (6th Cir.1988); *In re Okoreeh–Baah*, 836 F.2d 1030 (6th Cir.1988). No single factor is conclusive, even the existence of a debt that is nondischargeable in Chapter 7. *Caldwell II*, 895 F.2d at 1126; *Doersam*, 849 F.2d at 239; *Okoreeh–Baah*, 836 F.2d at 1032–33; *In re Kourtakis*, 75 B.R. 183 (Bankr.E.D.Mich.1987).

The critical issue whether there is a "sincerely-intended repayment of prepetition debt consistent with the debtor's available resources." *Okoreeh–Baah*, 836 F.2d at 1033; *Barrett*, 964 F.2d at 592.

■ The debtor bears the burden of proving his good faith. *Caldwell II*, 895 F.2d at 1126.

## V.

■ In this case, four primary factors lead the Court to the conclusion that the debtor filed his petition in bad faith.

First, the original debt to this creditor was incurred by fraud, as found by Judge Patton in his opinion of January 4, 1982, sustaining the creditor's claim that its debt should be held nondischargeable:

Essentially, the issue to be examined is whether the tender of a check written on a closed account constitutes a false pretense or false representation. It is obvious that Kuriakuz intended to deceive G.P.Q. and obtain merchandise with a worthless check, a check incapable of being honored by the bank. Furthermore, Kuriakuz had been informed by the bank that the account was closed almost one month before the check was written. Thus, there could exist no reasonable mistake or inadvertence on the part of the defendant, Kuriakuz. The Court holds that this action by Kuriakuz constitutes a false pretense and false representation.

*In re Kuriakuz*, No. 78–03195–P, slip op. at 6 (Bankr.E.D.Mich. Jan. 4, 1982).

As noted, this circumstance by itself would not likely result in a finding of bad faith. If such a circumstance had been followed by a sincere and genuine effort and intent to repay the debt, then good faith might well be found. *Barrett*, 964 F.2d at 592.

However, a second circumstance leads to the conclusion that the debtor has no sincere and genuine intent to repay this creditor. That circumstance arises from the discrepancy between the claim that he made to AAA that he had lost wages from an auto accident in 1985 and the claim that he made in testimony to the creditor in 1991 that he had no income from Mack and Bewick. It is more likely that his claim to AAA was accurate, since it was independently verified at the time. Thus, it is likely that the debtor's testimony to the creditor in 1991 about his income was false. The Court concludes that this deception was a continuation of the pattern of fraud, hinderance and delay aimed at this creditor

that had begun when the debtor first wrote the bad check to the creditor. *See Caldwell II*, 895 F.2d at 1127. In any event, such testimony is inconsistent with a sincere desire to deal honestly with creditors and to repay debts.

 The third factor is the extremely low dividend offered in the debtor's initial plan, 7.7%. Again, by itself this factor is not conclusive of bad faith. Nothing in the Bankruptcy Code explicitly prohibits such a plan. However, a Chapter 13 plan which proposes to repay only a small portion of a debt which could not be discharged under Chapter 7 deserves "particular scrutiny." *Caldwell II*, 895 F.2d at 1126 (citing *In re Warren*, 89 B.R. 87, 95 (9th Cir. BAP 1988)).

In this case, the original offer of 7.7%, made in context of a continuing pattern of fraud and deception, is so insignificant as to constitute a further continuation of that pattern, rather than a change from it. Certainly there is nothing explicit in the debtor's budget that suggests any further ability to pay, and viewed in the abstract, the budget is reasonable by any objective standard. But the debtor's budget and the resulting plan simply cannot be viewed in the abstract. The debtor's best efforts under 11 U.S.C. § 1325(b) (1989), without more, are not enough. *Caldwell II*, 895 F.2d at 1126 (citing *In re Girdaukas*, 92 B.R. 373, 376 (Bankr.E.D.Wis.1988)).

The fourth factor occurred when the debtor agreed at the confirmation hearing to increase his payments and the dividend to creditors. No doubt the debtor offered this increase in order to avoid an objection by the trustee, whose usual practice is to object to plans offering less than 10%. Indeed, the order confirming the plan makes specific reference to this floor. The debtor's offer to nearly double his payments (from $11.54 per week to $94 per month) appears admirable when viewed in isolation. However, as noted, nothing can be viewed in isolation. The effect of this offer upon the debtor's good faith must be evaluated in the context of the extraordinarily flexible and questionable financial and employment relationships between the debtor and his wife over the years. The debtor's information concerning who actually owned which businesses, and who employed whom at what pay and for how many hours, has simply lacked credibility both in the past and in this case. The Court concludes that it is just as likely that the debtor and his wife have manipulated his income and his budget in order to pay a minimal dividend to his creditors in this case as it is that the debtor's circumstances are genuinely as he asserts. The debtor's lack of credibility on these issues makes it impossible for him to meet his burden of proving his good faith.

Accordingly, the Court finds that the debtor's Chapter 13 case was filed in bad faith and should be dismissed.

IT IS SO ORDERED.